UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS,

    Plaintiff,

        v.                                       Civil Action No. 14-1190 (JEB)

INTERNAL REVENUE SERVICE, *et al.*,

    Defendants.

**MEMORANDUM OPINION**

    Because the federal tax code is both "massive and complicated," many taxpayers seek assistance in preparing their returns. See Loving v. IRS, 742 F.3d 1013, 1014 (D.C. Cir. 2014). Tax assistance, however, is not a one-size-fits-all profession. On the contrary, several different types of tax practitioners exist – *e.g.*, certified public accountants, attorneys, enrolled agents, and unenrolled tax preparers. Each is subject to varying degrees of licensing and regulatory oversight.

    In 2011, the Internal Revenue Service promulgated the Registered Tax Return Preparer Rule, which imposed – for the first time – mandatory federal licensing requirements and standards of conduct on approximately 600,000 unenrolled tax preparers. Three such preparers brought suit, claiming that the new regulations fell outside the scope of the IRS's statutory authority. This Court agreed and enjoined the Service from enforcing the regulatory scheme, see Loving v. IRS, 917 F. Supp. 2d 67 (D.D.C. 2013), and the D.C. Circuit subsequently affirmed. See Loving, 742 F.3d 1013.

1

In a separate Opinion in that case denying the IRS's interim motion to stay the injunction pending appeal, this Court observed that its ruling did not "requir[e] the IRS to dismantle its entire scheme." Loving v. IRS, 920 F. Supp. 2d 108, 111 (D.D.C. 2013). Instead, the agency "may choose to retain the testing centers and some staff, as it is possible that some preparers may wish to take the exam or continuing education even if not required to." Id. The Court further remarked that "[s]uch voluntarily obtained credentials" might allow preparers to "distinguish" themselves. Id.

In July 2014, taking the Court's observation to heart, the IRS established the Annual Filing Season Program. Rather than mandating compliance like its predecessor, the new Program seeks to encourage unenrolled tax preparers to voluntarily augment their understanding of federal taxation. Notwithstanding this modification, the IRS's initiative has again triggered litigation in this Court over the scope of the agency's authority. But this time around, the challenge comes from a surprising source. Plaintiff American Institute of Certified Public Accountants does not represent the unenrolled tax preparers targeted by the Program; instead, its membership consists of individual certified public accountants and accounting firms.

Arguing that AICPA and its members have suffered no harm from the program, Defendants IRS and the IRS Commissioner have now moved to dismiss the suit for lack of standing. Agreeing, the Court will grant Defendants' Motion.

I. **Background**

A. The Tax-Preparation Industry

Title 31 U.S.C. § 330 authorizes the Treasury – and, by extension, the IRS, an agency within the Treasury Department – to "regulate the practice of representatives of persons before the Department of the Treasury." 31 U.S.C. § 330(a)(1). Pursuant to this statutory authority, the

2

IRS has long published regulations that mandate standards of competence and conduct for tax professionals who appear in adversarial proceedings before the agency. See Loving, 742 F.3d at 1015. The Treasury reprints these regulations under the name "Treasury Department Circular No. 230." Loving, 917 F. Supp. 2d at 71.

Four major categories of tax practitioners exist: (1) CPAs; (2) attorneys; (3) enrolled agents; and (4) unenrolled tax-return preparers. See Compl., ¶¶ 18-21. Historically, members of the first three classes have been subject to the duties and restrictions laid out in Circular 230, in addition to rigorous state or federal credentialing requirements. See Mot. at 3 n.2; Compl., ¶¶ 18-22; Loving, 917 F. Supp. 2d at 71. The majority of tax-return preparers, however, are "unenrolled" or "uncredentialed." Prior to the rule invalidated in Loving, such individuals – whose practice is restricted, for the most part, to preparation of tax returns rather than representation of taxpayers before the IRS – were not subject to licensure requirements or to the dictates of Circular 230. See Compl., ¶ 21; Loving, 917 F. Supp. 2d at 71.

B.  The Registered Tax Return Preparer Rule

In June 2011, concerned by this gap in regulatory coverage, the IRS promulgated the Registered Tax Return Preparer Rule. The Rule altered the pre-existing landscape for unenrolled tax preparers by bringing them within the ambit of Circular 230 and requiring that they "register" with the IRS. Loving, 917 F. Supp. 2d at 71. To initially register, the Rule demanded that these preparers pass both a qualifying exam and a character-and-fitness assessment. Id. To maintain registration, they needed to pay annual fees and complete 15 hours of continuing education courses. See 76 Fed. Reg. 32,287, 32,303; Compl., ¶ 24.

A trio of unenrolled tax-return preparers sought judicial review, contending that the IRS's statutory authority "to regulate the practice of representatives before the Department of the

Treasury" did not permit the agency to regulate uncredentialed preparers whose practice is limited to the preparation and submission of tax returns. Although acknowledging that the Rule "may very well have significant salutary effects," Loving, 917 F. Supp. 2d at 79, this Court agreed with the plaintiffs and permanently enjoined the agency from enforcing it in Loving, 917 F. Supp. 2d 67. The D.C. Circuit, in a unanimous decision, upheld the decision. See Loving, 742 F.3d 1013.

    C.  The Annual Filing Season Program

Undeterred from its mission to ensure "[b]asic competency for paid tax return preparers" in a post-Loving world, the Administration proposed to Congress that the Treasury Department be granted explicit legislative authority to regulate all tax-return preparers. See Rev. Proc. 2014-42, § 2. Aware that the enactment of such legislation could take some time, however, the Treasury Department and the IRS established the Annual Filing Season Program as a stopgap measure. Id.

The Program is designed to encourage uncredentialed tax-return preparers – *i.e.*, those preparers "who are not attorneys, . . . CPAs . . . , or enrolled agents" – to "improve their knowledge of federal tax law." Id. The criteria for participation are strikingly similar to the requirements of the 2011 Rule: preparers must pass a course-related comprehension test, complete between 15 and 18 hours of continuing education, and consent to be subject to Circular 230. Id. § 4.05. One highly salient distinction exists: "no tax return preparer is required to participate" in the Program. Id. § 3 (emphasis added). Instead, an individual who voluntarily chooses to participate is rewarded with a "Record of Completion" and listed in a directory of preparers with credentials or other qualifications. Id. § 4.02; Compl., ¶ 39. The directory is to be made available on the IRS's website. See Compl., ¶ 39.

    D.  <u>The Current Action</u>

Like the now-defunct 2011 Rule, the newly established Program has sparked ardent opposition. On July 15, 2014, Plaintiff AICPA filed suit against the IRS and its Commissioner, alleging that the Program constitutes arbitrary and capricious agency action promulgated in excess of the agency's statutory authority. Defendants moved to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). They contend that AICPA – whose membership consists of "individual CPAs and accounting firms," Compl., ¶ 12, rather than uncredentialed tax preparers – lacks standing to challenge the Program.

Upon the completion of briefing on Defendants' Motion, Plaintiff moved to strike the "new" arguments raised in Defendants' Reply. <u>See</u> Mot. to Strike at 2-3. If a movant raises arguments for the first time in his reply to the non-movant's opposition, the Court may either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments. <u>See</u> <u>Lu v. Lezell</u>, 2014 WL 2199314, at *2 (D.D.C. May 27, 2014). Here, the Court chose the latter course, permitting AICPA to file a Sur-reply in order to alleviate any risk of sandbagging. <u>See</u> Minute Order of Oct. 15, 2014. Plaintiff also challenges Defendants' submission of ten declarations as an accompaniment to their Reply. As the Court finds consideration of that evidence unnecessary to a resolution of the standing question, it need not further address its admissibility.

**II.**    **Legal Standard**

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal

citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). This standard governs the Court's consideration of motions under both Rules 12(b)(1) and 12(b)(6). See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)). Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d 359, 366 (D.C. Cir. 2005) ("[G]iven the present posture of this case – a

dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings."); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III. Analysis**

Plaintiff asserts three theories of standing here, claiming that its members: (1) "employ individuals [*i.e.*, uncredentialed tax preparers] who will be injured by the additional regulatory burdens created by the AFS Rule"; (2) "will be directly injured by the AFS rule because it requires firms to 'take reasonable steps' to ensure that their newly regulated employees comply with Circular 230"; and (3) "will suffer injuries because the rule will cause confusion among consumers." Compl., ¶ 12.

Defendants attack AICPA's position on two distinct axes. They first mount a global challenge to all three of Plaintiff's theories, emphasizing that the Program is "voluntary" and that all of AICPA's alleged injuries "depend upon a substantial number of [third-party] uncredentialed preparers" choosing to participate in the Program. Mot. at 9-10. According to Defendants, "[A] voluntary act by a third party between the defendant's act and the plaintiff's injury breaks the chain of causation required for standing." Id. at 9. They then take up Plaintiff's three theories *seriatim*, contending that each one suffers from individual defects. See Mot. at 13.

While the categorical nature of Defendants' first challenge is superficially appealing, the Court is not convinced that the law on voluntary third-party action is quite as settled as Defendants suggest. See Renal Physicians Ass'n v. Dep't of Health, 489 F.3d 1267, 1273-79 (D.C. Cir. 2007) (collecting cases on voluntariness); see also, e.g., Tozzi v. Dep't of Health & Human Services, 271 F.3d 301 (D.C. Cir. 2001) (manufacturer had standing to challenge governmental action even though alleged impact resulted from voluntary conduct of third

7

parties); Nat'l Wrestling Coaches Ass'n v. Dep't of Education, 366 F.3d 930 (D.C. Cir. 2004) (plaintiff did not have standing where third-party voluntary conduct severed chain of causation). The Court need not agonize over this issue, however, because it agrees with Defendants' second set of challenges: each of Plaintiff's assertions of standing is fatally flawed in its own right. The Court will begin with a brief explication of standing law and proceed to separate considerations of Plaintiff's three theories.

    A.  Standing

Article III of the United States Constitution limits the jurisdiction of the federal courts to resolving "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan, 504 U.S. at 560. To have standing, a party must, at a constitutional minimum, meet the following criteria. First, the plaintiff "must have suffered an 'injury in fact' – an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" Id. (internal quotation marks and citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (alterations in original) (citation omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 560-61 (citation omitted). A "deficiency on any one of the three prongs suffices to defeat standing." U.S. Ecology, 231 F.3d at 24.

Here, Plaintiff does not claim injury to itself, but to its members. When an organization is suing on behalf of its members, it must establish "representational" or "associational"

standing. To do so, it needs to show that "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." American Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005) (citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)). As the discussion in Sections B-D, *infra*, makes manifest, the battle over associational standing in this case is waged on the first prong only.

Finally, because the agency program at issue here is not directed at Plaintiff or its members, but at third-party uncredentialed tax preparers, a "heightened showing" is required to establish standing. Renal Physicians, 489 F.3d at 1273. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Id. (quoting Lujan, 504 U.S. at 562).

### B. Theory One: Injury to AICPA Members' Employees

Plaintiff's first theory of injury – as laid out in its Complaint – states that "[c]ertain accounting firms that are members of the AICPA employ individuals [*i.e.*, unenrolled tax preparers] who will be injured by the additional regulatory burdens created by the AFS Rule." Compl., ¶ 12. This formulation, which does not allege injury to AICPA or its members but rather to its members' employees, is a nonstarter. As Defendants explain, and as Plaintiff never contests, employers do not have standing based upon the injuries of their employees, except in limited circumstances not alleged here. See, e.g., Int'l Union v. Dana Corp., 278 F.3d 548, 559 (6th Cir. 2002); Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 809-10 (11th Cir. 1993).

Perhaps realizing the error inherent in its earlier phrasing, Plaintiff in its Opposition now seeks to reframe the injury. It claims that its member firms have standing to challenge the Program because the costs of their employees' compliance will be shifted to the firms themselves. See Opp. at 12. As support for its theory, AICPA proffers several declarations signed by managers of its member firms. See, e.g., Opp., Exh. E (Declaration of David Kerber), ¶ 5 ("[T]o comply with the AFS Rule, many tax return preparers will be required to pass an examination. Preparing for and taking that examination will result in lost employee work hours. And KerberRose [an AICPA accounting firm] will reimburse employees for the costs of complying with the AFS Rule, including costs associated with the examination."); Id., Exh. G (Declaration of Joel Olbricht), ¶ 6 ("Completing the continuing education requirement, attending the refresher course, studying for the examination, and taking the examination will take time and cost money. These costs will be passed on to [the AICPA member firm].").

As a general matter, however, a plaintiff's own voluntary actions (in contrast to the voluntary third-party actions discussed earlier) operate to sever the causal chain necessary to establish standing. See Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 178 (D.C. Cir. 2012); Petro-Chem Processing, Inc. v. EPA, 866 F.2d 433, 438 (D.C. Cir. 1989). Plaintiff offers no reason to believe that the alleged injuries to AICPA's members – should they materialize – can be characterized as anything but voluntarily "self-inflicted." Grocery Mfrs., 693 F.3d at 178. These firms are in no sense required to reimburse employees for the costs of compliance, nor are they obligated to credit the time employees spend complying with the Program as hours worked on behalf of the firm. While policies aimed at absorbing such costs might make good sense as a matter of economics or employee morale, "economic considerations that cause [a plaintiff] to reject a certain option because it is less favorable in some ways and more favorable in others do[]

10

not transform an otherwise voluntary decision into a coerced one." Huron v. Berry, 2013 WL 6791978, at *6 (D.D.C. Dec. 23, 2013). This injury, alleged by AICPA on behalf of its members, thus cannot be "fairly trace[d]" to the challenged Program. Id. at *5; see also Grocery Mfrs., 693 F.3d at 177 (rejecting standing where plaintiff's choice to incur potential injury was "grounded in economics" and not required by the challenged agency action).

  C. Theory Two: Injury in Connection with Circular 230

  AICPA's second theory of standing asserts that its members "will be directly injured by the AFS [Program] because it requires firms to 'take reasonable steps' to ensure that their newly regulated employees comply with Circular 230." Compl., ¶ 12. As an initial matter, the "reasonable steps" language is found in Section 10.36 of Circular 230, not in the challenged Program. Section 10.36 states that "[a]ny individual" subject to Circular 230 who has "responsibility for overseeing a firm's practice," including the "preparation of tax returns," "must take reasonable steps to ensure that the firm has adequate procedures in effect for all members, associates, and employees" to comply with the standards laid out in Circular 230. See 31 C.F.R. § 10.36(a). "[I]ndividual[s]" subject to Circular 230 include CPAs, attorneys, and enrolled agents. AICPA-member CPAs who possess principal authority in their firms thus have a supervisory obligation over their employees pursuant to Section 10.36.

  Why then does Plaintiff assert that the Program injures its members in their supervisory capacity? Although the logical steps of its argument are never clearly set out, the Court infers that AICPA's reasoning goes as follows: AICPA believes that Section 10.36 requires its members to supervise only those employees who are themselves subject to Circular 230. Because unenrolled tax preparers who participate in the Program will now join that category,

Plaintiff asserts that its members' supervisory obligations will extend to a greater number of employees.

AICPA's argument rests on a mistaken premise. Whether unenrolled tax preparers participate in the Program or not is immaterial to the supervisory obligation imposed by Section 10.36. As the IRS reasonably explains, that section imposes a responsibility on managerial CPAs to oversee "all" of their employees involved in the preparation of tax returns, regardless of whether those employees are themselves subject to Circular 230. 31 C.F.R. § 10.36(a); see Reply at 12-13. In other words, the Program has no effect on Plaintiff's members' supervisory duties.

Plaintiff's theory of standing is therefore unavailing. Any objection AICPA wishes to make to the "reasonable steps" obligation, see Opp. at 22-23, must be raised in a challenge to Circular 230 rather than to the Program.

D.  Theory Three: Injury Resulting from Confusion

Finally, AICPA contends that the Program will injure its members by "caus[ing] confusion among consumers." Compl., ¶ 12. Defendants, for their part, respond that those allegations are conclusory and "without foundation." Reply at 16-17. They are correct.

Plaintiff advances two types of confusion that might – hypothetically – emanate from the Program. AICPA first claims that the Program will allow uncredentialed preparers to "advertise their credentials in a way that suggests they have special training from the IRS," are "preferred vendors" of the IRS, or are "endorsed" by the Service. See Opp. at 14-15, 19. This assertion is belied by the terms of the Program itself. Section 4.07 expressly forbids participating tax preparers from "us[ing] the term 'certified,' 'enrolled,' or 'licensed'" and from making any sort of "representations that the IRS has endorsed the tax return preparer." Rev. Proc. 2014-42, §

4.07. A preparer is permitted to state only that she "holds a valid Annual Filing Season Program Record of Completion for that calendar year and that . . . she has complied with the IRS requirements for receiving the Record of Completion." Id. The correctness of this straightforward representation cannot be seriously disputed, and the Court finds that confusion is unlikely to result from any such advertisement.

Second, AICPA urges that the Program will spawn "several new categories of tax return preparers, and that the rapid proliferation of these categories will confuse consumers." Opp. at 23. Specifically, Plaintiff states that the Program will create four additional categories – namely, CPAs who complete the Program, attorneys who complete the Program, enrolled agents who complete the Program, and unregistered preparers who complete the Program.

Plaintiff's fear is far too speculative to support its claim of injury. To begin with, its insistence that a substantial number of CPAs, attorneys, or enrolled agents will complete the Program, thus creating four new categories of tax-return preparers, is entirely unsubstantiated. The Program is not directed at attorneys, CPAs, or enrolled agents, each of whom already possesses higher-level credentials. See Rev. Proc. 2014-42, § 1 ("This revenue procedure provides guidance regarding a new, voluntary Annual Filing Season Program designed to encourage tax return preparers who are not attorneys, certified public accountants (CPAs), or enrolled agents (EAs) to complete continuing education courses . . . ."). AICPA has proffered no evidence suggesting that any such individuals do in fact intend to complete the Program, notwithstanding its stated purpose.

Fairly viewed, the Program arguably creates one additional "category" of tax preparers: unenrolled tax preparers who participate in the Program and receive a Record of Completion. Nothing about that category is inherently confusing. As Defendants point out, moreover,

Plaintiff does not allege that consumers are currently confused by the various credentials held by competing preparers. See Mot. at 17. AICPA provides no reason to believe that the introduction of this particular terminology into the tax-preparer lexicon will result in so confusing a state of affairs as to injure its members.

Beneath its amorphous rhetoric about confusion, the crux of Plaintiff's concern is apparent: its membership feels threatened by the specter of increased competition from previously uncredentialed preparers who choose to complete the program. Increased competition stemming from governmental action can, under certain circumstances, provide a basis for standing. See Sherley v. Sebelius, 610 F.3d 69, 73 (D.C. Cir. 2010). But, as the D.C. Circuit has made clear, so-called "competitor standing" cannot be premised on pure conjecture or *ipse dixit*. See id. To demonstrate a constitutionally sufficient competitive injury, an aspiring litigant must show "an actual or imminent increase in competition" resulting from the challenged regulatory action. Id.; see also DEK Energy Co. v. FERC, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (nixing competitor standing where there existed only "some vague probability" of increased competition and "a still lower probability" of injury stemming from that competition).

Here, Plaintiff's speculative allegations that customers will utilize Program-participating unenrolled tax preparers instead of CPAs, see Opp. at 15, do not bridge the "gulf between . . . the 'imminent' injury that suffices and the merely 'conjectural' one that does not." Dek Energy, 247 F.3d at 1195. CPAs already operate in a competitive market in which several different types of qualified preparers have carved out individualized niches. AICPA has not demonstrated that permitting unenrolled preparers to distinguish themselves vis-à-vis other unenrolled preparers will result in competitive injury to CPAs and accounting firms who compete on the basis of more rigorous credentials.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss. A separate Order consistent with this Opinion shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  October 27, 2014