**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS,**

  **Plaintiff,**

  v.

**INTERNAL REVENUE SERVICE,** *et al.*,

  **Defendants.**

**Civil Action No.  14-1190 (JEB)**

---

<u>**MEMORANDUM OPINION**</u>

Unlike the legal-services market, the tax-preparation ecosystem is a biodiverse habitat within which four species of tax-preparers compete for clients – certified public accountants (CPAs), attorneys, enrolled agents, and unenrolled tax preparers.  The first three are subject to varying levels of licensing requirements and regulatory controls, while the fourth – some 600,000 unenrolled preparers – have long remained in the regulatory shadows.  In 2011, the IRS decided the time had come for unenrolled preparers to show their *bona fides*.  It thus promulgated a rule that would have required all unenrolled preparers to, among other things, pass a qualifying exam and satisfy continuing-education requirements.  Three unenrolled preparers displeased by these new requirements filed suit, and this Court along with the Court of Appeals agreed that the IRS had exceeded its statutory authority in creating the new rule.

Undaunted, the IRS in July 2014 created the Annual Filing Season Program, a certification regime that contained many of the same components as the prior unlawful rule but made all participation voluntary.  Notwithstanding its noncompulsory character, this program also had its detractors, who believed the IRS lacked authority to create it.  This time, though, it

1

was not the unenrolled preparers bringing suit, but rather the American Institute of Certified

Public Accountants, a professional organization that represents accountants and accounting firms

– some of which also employ unenrolled preparers.  This Court granted the IRS's motion to

dismiss on standing grounds for lack of injury, but the D.C. Circuit reversed.  In so doing,

however, the Court of Appeals indicated that it was not determining whether AICPA had also

demonstrated its entitlement to sue – *i.e.*, whether it came within the zone of interests protected

by the relevant statute.  This prompted the IRS on remand to file a Motion for Judgment on the

Pleadings with regards to that very issue.  As the Court ultimately concludes that AICPA does

not fall within the applicable zone of interests, it will grant Defendants' Motion.

**I.      Background**

  A.  Tax-Return-Preparer Market

  When someone wants help preparing his taxes – April is the cruelest month – he will

usually look to one of "four groups: (1) certified public accountants (CPAs); (2) lawyers; (3)

'enrolled agents'; and (4) unenrolled preparers."  Am. Inst. of Certified Pub. Accountants v. IRS

(AICPA II), 804 F.3d 1193, 1194 (D.C. Cir. 2015).  The first three are regulated by either the

IRS or state adjuncts: "CPAs and attorneys are subject to state professional licensing regimes,

and enrolled agents are licensed by the IRS and subject to various IRS requirements including

taking continuing education courses and passing an exam."  Id. at 1194-95.  All three are also

bound by the strictures of IRS Circular 230, "which includes rules and disciplinary procedures

for practice before the IRS."  Id. at 1194.

  The fourth group – unenrolled preparers – is simultaneously the least regulated and the

most numerous, comprising around 60% of the tax-return-preparation market.  Id. at 1198.  Apart

from being required to obtain and use a "Preparer Tax Identification Number," Treas. Reg.

§ 1.6109–2, they are not otherwise required to take classes, pass an exam, or demonstrate

competency in preparing tax returns.  See AICPA II, 804 F.3d at 1195.

     B.  The 2011 Rule and *Loving*

In 2011, the IRS decided it was time to take a closer look at unenrolled preparers.  In

June of that year, it promulgated a rule, see Registered Tax Return Preparer Rule, 76 Fed. Reg.

32,286 (June 3, 2011), that would have required any unenrolled preparer to pass a qualifying

examination, complete fifteen hours of continuing-education courses annually, and subject

herself to Circular 230, a document that, as mentioned, provides details regarding what counts as

sanctionable conduct and the procedural particulars of the IRS's disciplinary regime.  See id. at

32,301, 32,303, 32,306; see also 31 C.F.R. §§ 10.20-.38.

In crafting the rule, it relied on a 132-year-old section of the Internal Revenue Code, 31

U.S.C. § 330(a), which gives the Treasury Secretary, subject to certain conditions not relevant

here, authority to

> (1) regulate the practice of representatives of persons before the Department of the Treasury; and
>
> (2) before admitting a representative to practice, require that the representative demonstrate—
>
>> (A) good character;
>>
>> (B) good reputation;
>>
>> (C) necessary qualifications to enable the representative to provide to persons valuable service; and
>>
>> (D) competency to advise and assist persons in presenting their cases.

§ 330(a) (2012) (full text republished in Appendix to this Opinion). [1]  The IRS homed in on its

_____

[1] Section 330 has since been modified, effective December 18, 2015, such that what was formerly § 330(b) is now codified in § 330(c).  See Pub. L. 114-113, § 410, 129 Stat. 2242, 3121 (Dec. 18, 2015).  All references to § 330 in this Opinion refer to the earlier (2012) edition.

power in § 330(a)(1) to "regulate the practice of representatives of persons before the Department" as justifying its regulatory ambitions.  See 76 Fed. Reg. at 32286.

Three unenrolled preparers challenged the rule, arguing that its promulgation exceeded the IRS's authority under that statutory provision.  This Court agreed, granting summary judgment to the plaintiffs and enjoining enforcement of the rule.  See Loving v. IRS (Loving I), 917 F. Supp. 2d 67, 74 (D.D.C. 2013).  On appeal, the D.C. Circuit affirmed, concluding that when a person acts as a tax-return preparer, she is not acting as a "representative" of her client as that term is used in § 330(a)(1).  Loving v. IRS (Loving III), 742 F.3d 1013, 1017 (D.C. Cir. 2014).  Reinforcing this reading, the phrases "practice . . . before the [IRS]" and "presenting their cases" in §§ 330(a)(1) and (2) make clear that Congress was intending to give the IRS the power to regulate representatives in "traditional adversarial proceedings" like audits, rather than non-adversarial activities like preparing and filing a tax return.  Id. at 1017-18.  Because "the process of filing a tax return" is essentially "one of self-assessment" and demands neither "arguments [n]or advocacy in support of the taxpayer's position," the court concluded that "tax-return preparers do not practice before the IRS when they simply assist in the preparation of someone else's tax return," and are thus not "representatives" who fall within the IRS's regulatory orbit. Id. (citations and quotation marks omitted).

One additional point is worth noting.  Although this Court permanently enjoined the IRS from enforcing the rule upon entry of its summary-judgment order, see Loving I, 917 F. Supp. 2d at 81, it subsequently narrowed the scope of that injunction when ruling on the IRS's request for a stay pending appeal.  See Loving v. IRS (Loving II), 920 F. Supp. 2d 108, 109 (D.D.C. 2013). The Court denied the IRS's request, but in so doing made clear that it was

> not requiring the IRS to dismantle its entire scheme.  It may choose
> to retain the testing centers and some staff, as it is possible that some

4

> preparers may wish to take the exam or continuing education even
> if not required to. Such voluntarily obtained credentials might
> distinguish them from other preparers.

Id. at 111. Perhaps taking this clarification to heart, the IRS decided to retain much of the rule's

infrastructure, but did so by relying on tax preparers' willingness to voluntarily participate. It is

this voluntary program that sits at the heart of the current suit.

C.   The 2014 Annual Filing Season Program

In July 2014, the IRS released Revenue Procedure 2014-42, albeit without notice and

comment, in which it created the Annual Filing Season Program. See Rev. Proc. 2014-42 (AFS

Program), 2014-29 I.R.B. 192 (2014); see also Internal Revenue Manual 32.2.2.3.2 (Aug. 11,

2004) (defining "Revenue Procedure" as "an official statement of a procedure by the Service that

affects the rights or duties of taxpayers or other members of the public under the Internal

Revenue Code, related statutes, tax treaties, and regulations, or information that, although not

necessarily affecting the rights and duties of the public, should be a matter of public

knowledge"). The "new, voluntary [AFS] Program [is] designed to encourage tax return

preparers who are not attorneys, certified public accountants (CPAs), or enrolled agents (EAs)" –

i.e., who are unenrolled preparers – "to complete continuing education courses for the purpose of

increasing their knowledge of the law relevant to federal tax returns." Id. § 1 (emphasis added).

The Program allows these unenrolled preparers to apply for a "Record of Completion,"

which the IRS will issue "[u]pon verification that the requirements in section 4 of this revenue

procedure have been met." Id. § 4. Those requirements include, inter alia, (a) obtaining a

preparer-tax identification number, (b) taking an annual "federal tax filing season refresher

course," (c) passing a comprehension test, (d) completing a minimum of fifteen hours of

continuing education annually; and (e) consenting to be "subject to the duties and restrictions

relating to practice before the IRS in [specified portions] of Circular 230." Id.

Quite unlike the 2011 rule, "no tax return preparer is required to participate." Id. § 3. The IRS did, however, create several incentives to drum up interest. First are reputational benefits. The IRS designed the Program to allow successful participants to "'stand out from the competition by giving them a recognizable [R]ecord of [C]ompletion that they can show to their clients.'" Compl., ¶ 7 (quoting Defendant IRS Commissioner John Koskinen). In addition, participants' names also appear in the IRS's online Directory of Federal Tax Return Preparers with Credentials and Select Qualifications. See http://irs.treasury.gov/rpo/rpo.jsf (last visited August 3, 2016).

The second major incentive is obtaining the ability to "practice" before the IRS in limited circumstances. Prior to the AFS Program, any unenrolled preparer could "engage in [such] limited practice by representing taxpayers before the IRS during an examination with respect to tax returns and claims for refund that the RTRP prepared and signed." Rev. Proc. 2014-42, § 2. In other words, unenrolled preparers could assist clients during an audit, but only as to those tax returns that the preparer had herself prepared. Upon creation of the AFS Program, however, the IRS conditioned this "limited practice right" on successfully obtaining a Record of Completion, meaning that unenrolled preparers who declined to participate would no longer be able to engage in "limited practice" before the IRS. See id. § 6.

D.  Procedural History

AICPA filed suit shortly after IRS announced the Program, seeking a declaration that it was unlawful and an order enjoining its implementation. See Compl. at 22-23. The IRS moved to dismiss for lack of standing, arguing that not a single one of Plaintiff's members had suffered a constitutionally sufficient injury. See ECF No. 8 (Mot. to Dismiss) at 2. Plaintiff, in turn, countered with three theories of injury it thought sufficient to establish Article III standing. See

ECF No. 10 (Opp. to Mot. to Dismiss) at 20-24.  As will be explained in more detail below, see

infra Section III.B.2, this Court concluded that none of the three theories passed muster and

granted the IRS's Motion.  See Am. Inst. of Certified Pub. Accountants v. IRS (AICPA I), No.

14-1190, 2014 WL 5585334, at *5 (D.D.C. Oct. 27, 2014), rev'd sub nom. AICPA II, 804 F.3d

1193 (D.C. Cir. 2015).

AICPA nevertheless found some success on appeal.  In late 2015, the Court of Appeals

concluded that it did have standing on at least one narrow basis: competitive injury.  See AICPA

II, 804 F.3d at 1197.  On that point, the court concluded that

> [AICPA's] members . . . will face intensified competition as a result
> of the [AFS Program]. Specifically, participating unenrolled
> preparers will gain a credential and a listing in the government
> directory. [AICPA] alleges—and we must accept as true for
> purposes of assessing its standing—that this will "dilute[] the value
> of a CPA's credential in the market for tax-return-preparer services"
> and permit unenrolled preparers to more effectively compete with
> and take business away from presumably higher-priced CPAs.

Id. (quoting AICPA's Reply Br. at 12).  It therefore reversed this Court's dismissal and

remanded for further proceedings.  Id. at 1199.

In reaching its decision, however, the Court of Appeals discussed two important points

relevant here.  First, it made clear that it was only deciding that the competitive-injury-via-brand-

dilution theory of standing sufficed for meeting Article III's injury-in-fact requirement.  Second,

that court gave passing mention to an issue raised by the IRS for the first time on appeal –

namely, that AICPA's "grievance does not arguably fall within the zone of interests protected or

regulated by the statutory provision it invokes."  Id. (citations and quotation marks omitted).  But

because "the IRS never presented this argument to the district court," the D.C. Circuit declined to

address it.

Quite predictably, on remand the IRS filed a Motion for Judgment on the Pleadings, arguing that AICPA falls outside the "zone of interests" protected or regulated by the relevant provisions of the Internal Revenue Code.  That Motion is now ripe.

## II.    Legal Standard

This Court evaluates a Rule 12(c) motion for judgment on the pleadings under the same standard as a Rule 12(b)(6) motion to dismiss.  See Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 130 (D.C. Cir. 2012) ("Rule 12(c) motion" treated as "functionally equivalent to a Rule 12(b)(6) motion."); Robinson-Reeder v. Am. Council on Educ., 532 F. Supp. 2d 6, 12 (D.D.C. 2008).  The Court must therefore "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and it must thus be given every favorable inference that may be drawn from the allegations of fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) – or, in this case, a 12(c) – motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.

Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265,

286 (1986) (internal quotation marks omitted)).  For a plaintiff to survive such a motion even if

"recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be

enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56

(citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III.   Discussion

The only issue presented for decision in Defendant's Motion is whether "AICPA

arguably falls within the zone of interests to be protected by the statute" at issue.  See Mot. at 1.

The Court's analysis proceeds in two steps.  It will begin by setting forth the legal framework

and then proceed to determine whether the relevant "zone of interests" encompasses AICPA's

grievance.

### A.  Legal Framework

The zone-of-interests test, which has until recently been referred to as a species of

"prudential standing," is no longer really a question of standing at all.  See Crossroads

Grassroots Policy Strategies v. FEC, 788 F.3d 312, 319 (D.C. Cir. 2015) (citing Lexmark Int'l,

Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386-87 (2014)).  Instead, it is a

"statutory question" that asks "whether 'a legislatively conferred cause of action encompasses a

particular plaintiff's claim.'"  Mendoza v. Perez, 754 F.3d 1002, 1016 (D.C. Cir. 2014).  Likely

for this reason, satisfaction of the zone-of-interests test is no longer a "jurisdictional

requirement" and is instead "a merits issue."  Crossroads Grassroots, 788 F.3d at 319 (citations

omitted).

The zone-of-interests test, moreover, follows a particular path when a plaintiff, as here,

brings suit under section 10 of the Administrative Procedure Act, which provides a cause of

action for persons "aggrieved by agency action <u>within the meaning of a relevant statute</u>."  5

U.S.C. § 702 (emphasis added).  In construing the above-emphasized portion of § 702, the

Supreme Court concluded that Congress intended to require "that a plaintiff's grievance must

arguably fall within the zone of interests protected or regulated by the statutory

provision . . . <u>invoked in the suit</u>."  <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997) (emphasis

added); <u>accord</u> <u>Mendoza</u>, 754 F.3d at 1016.  In the case of a plaintiff bringing suit in a

representative capacity on behalf of its members – as AICPA does here – it is those members'

interests that are to be considered in determining whether the zone-of-interests test is satisfied.

<u>See</u> <u>Boston Stock Exch. v. State Tax Comm'n</u>, 429 U.S. 318, 321 n.3 (1977).

The Court understands that it must "apply the zone-of-interests test in a manner

consistent with 'Congress's evident intent when enacting the APA to make agency action

presumptively reviewable.'"  <u>Mendoza</u>, 754 F.3d at 1016 (quoting <u>Match-E-Be-Nash-She-Wish</u>

<u>Band of Pottawatomi Indians v. Patchak</u>, 132 S. Ct. 2199, 2210 (2012)).  Nevertheless, the

burden of demonstrating that a plaintiff's interest or grievance satisfies the test "falls squarely

on" the plaintiff.  <u>Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.</u>, 724 F.3d 243,

246 (D.C. Cir. 2013).

B.  <u>Application</u>

Defendant's argument here is facially simple: Plaintiff fails the zone-of-interests test

because its grievance (really, the grievance felt by its members) pertains to an interest that is

neither regulated nor protected by the "relevant statute," which the IRS maintains is 31 U.S.C.

§ 330.  <u>See</u> Opp. at 1; Mot. at 1.  Resolving this succinctly stated argument, however, requires

the Court to unpack and then answer a number of interrelated predicate questions.  First, what is

the "grievance" or interest at issue?  Second, is § 330 the "relevant statute" for defining the

applicable "zone of interests"?  Finally, how broad is the reach of the "relevant statute['s]" "zone

of interests," and does Plaintiff's properly defined "grievance" or interest come within it?  The

Court tackles each question in turn.

        1.  *Plaintiff's Grievance*

On the surface, AICPA's "grievance" seems straightforward: the AFS Program causes its

members some form of harm.  But when it comes to the zone-of-interests analysis, more

excatitude is necessary.  As the Supreme Court articulated in <u>Lujan v. National Wildlife</u>

<u>Federation</u>, 497 U.S. 871 (1990), the grievance or interest relevant to the "zone of injury" inquiry

is a precise one: "[T]he plaintiff must establish that the injury he complains of (<u>his</u> aggrievement,

or the adverse effect <u>upon him</u>) falls within the [relevant statute's] 'zone of interests.'"  <u>Id.</u> at 883

(emphasis in original).  Elaborating on this point, the D.C. Circuit has clarified that "on any

given claim[,] the injury that supplies constitutional standing <u>must be the same</u> as the injury

within the requisite 'zone of interests.'"  <u>Mountain States Legal Found. v. Glickman</u>, 92 F.3d

1228, 1232 (D.C. Cir. 1996) (emphasis added); <u>accord</u> <u>Texas v. United States</u>, 809 F.3d 134, 163

(5th Cir. 2015) ("Texas satisfies the zone-of-interests test not on account of a generalized

grievance but instead as a result of the same injury that gives it Article III standing."), <u>aff'd by</u>

<u>equally divided court sub nom.</u> <u>United States v. Texas</u>, 136 S. Ct. 2271 (2016).  This limitation is

quite important here, as the only injury that currently supplies AICPA with constitutional

standing – competitive injury by way of brand dilution – is a narrow one indeed.

    When the parties first disputed the question of constitutional standing, Plaintiff advanced

three theories of "injury in fact" resulting from the AFS Program, the third of which included

something akin to "competitive injury."  <u>AICPA I</u>, 2014 WL 5585334, at *5-7.  On that third

point, AICPA's core position was not that the credential offered by the IRS's Record of

Completion would dilute the CPA "brand" so to speak, but rather that the credential would create consumer confusion in the tax-return-preparer marketplace. See id. at *6-7. That "confusing . . . state of affairs," it believed, would somehow "injure its members." Id. at *7. This Court found none of the theories convincing, and it granted the IRS's motion to dismiss for lack of standing. Id.

On appeal, Plaintiff renewed the same three theories of injury, emphasizing again on its third theory that its "competitive injury" arose primarily from its belief that consumers in the tax-preparer marketplace would be confused by the new IRS "credential," and that such confusion would harm its members' business interests. See Br. of Appellant at 22-33, AICPA II, 804 F.3d 1193 (D.C. Cir. 2014). The Court of Appeals, however, took a different – and far narrower – approach: "We begin and end with the [AICPA's] claim of competitor standing." AICPA II, 804 F.3d at 1197. It concluded that AICPA had sufficiently alleged competitive injury because the AFS Program would "dilute[] [AICPA] members' credentials by introducing a government-backed credential and government-sponsored public listing." Id. at 1199 (citation and quotations omitted). This was true regardless of whether consumers were confused; the Court therefore found "no need to reach" the "confusion issue" "[d]espite the fervor with which the parties dispute[d]" it. Id. at 1198. Nor, for that matter, did the Court of Appeals wade into any of the other theories of injury in fact that this Court had found unavailing. See AICPA I, 2014 WL 5585334, at *5-7; AICPA II, 804 F.3d at 1197. With this procedural history fresh in mind, it becomes clear that the only "injury in fact" that has been affirmatively found to exist by either this Court or the Court of Appeals is AICPA members' competitive injury resulting from brand dilution.

Plaintiff acknowledges this point in its briefing, recognizing that certain "injuries" it contends will help it satisfy the zone-of-interest test have "not yet been held to provide Article III standing in this case."  Opp. at 20.  These injuries include its members' purported "interest in avoiding consumer confusion," id. at 17, and their interest in avoiding regulation as supervisors of unenrolled preparers who participate in the AFS Program (the "supervisory-harm" injury). See id. at 20-21.

While AICPA does not ask this Court to revise its initial conclusion as to the consumer-confusion issue, it does maintain that "this Court remains free" to change its mind on the supervisory-harm issue, albeit with only scant argument on that point.  See Opp. at 20-21.  While law of the case does not bar this Court from dipping a toe into those waters again, see, e.g., Mut. Life Ins. Co. of N.Y. v. Hill, 193 U.S. 551, 553-54 (1904) ("[A] judgment of reversal is not necessarily an adjudication by the appellate court of any other than the questions in terms discussed and decided."), it sees little justification for doing so here.  In particular, the Court in AICPA I carefully considered Plaintiff's supervisory-harm argument and rejected it, concluding that, to the extent Plaintiff suffered any harm at all, it derived not from the AFS Program but from supervisory obligations imposed by Circular 230.  See 2014 WL 5585334, at *6.  AICPA disagrees with that conclusion, but offers no convincing argument for why it must be revised.

Given that the zone-of-interests test may only be satisfied by an extant Article III injury, see Mountain States, 92 F.3d at 1232, the competitive-harm-by-brand-dilution injury is thus the only relevant "grievance" for determining whether AICPA satisfies the zone-of-interests test.

2. *Relevant Statute*

Having defined the contours of AICPA's "grievance," the next task is to identify the "relevant statute" from which the "zone of interests" emanates.  See 5 U.S.C. § 702 (party must

be "adversely affected or aggrieved by agency action within the meaning of a <u>relevant statute</u>")
(emphasis added).

Hoping to keep the zone as inclusive as possible, Plaintiff's most aggressive position is
that the relevant statute here is the APA itself, as opposed to any part of the Internal Revenue
Code.  <u>See</u> Opp. at 4 n.2 (Because "the IRS acted without even identifying a source of statutory
authority, the AICPA . . . satisfies the zone-of-interests test because it falls within the zone of
interests protected by the APA, without reference to any underlying statute.").  But the "relevant
statute" as that phrase is used in 5 U.S.C. § 702 does not refer to the APA, but rather the
underlying substantive statute that Plaintiff claims was violated by the challenged government
action.  <u>See</u> <u>Bennett</u>, 520 U.S. at 175 (zone-of-interests test turns on analysis of the "substantive
provisions of the [underlying statute]"); <u>Animal Legal Defense Fund v. Quigg</u>, 932 F.2d 920,
937 (Fed. Cir. 1991) ("[A]ppellants' reliance on section 706 of the APA as a 'relevant statute' is
misplaced.").  That analysis does not change even when the challenging party claims that the
agency acted beyond the bounds of its statutory authority, as AICPA alleges here.  <u>See</u>
<u>Amalgamated Transit Union v. Skinner</u>, 894 F.2d 1362, 1366 (D.C. Cir. 1990) (applying zone-
of-interests test with respect to substantive statute where plaintiff claimed agency exceeded
statutory authority); <u>accord</u> <u>Constructores Civiles de Centroamerica, S. A. (CONCICA) v.
Hannah</u>, 459 F.2d 1183, 1186 (D.C. Cir. 1972) (Plaintiff must "allege that the agency has acted
arbitrarily, capriciously, or in excess of its statutory authority, so as to injure an interest that is
arguably within the zone of interests to be protected or regulated by the statute . . . in question.")
(citation omitted).

As a fallback position, AICPA argues that the Program "runs afoul of [31 U.S.C. §] 330
as a whole."  Opp. at 22.  Yet Plaintiff does not appear to actually view the entirety of § 330 –

which is entitled "Practice before the Department" and contains four subsections lettered (a) through (d) – as the "relevant statute." Instead, it focuses nearly all of its attention on three specific parts: (1) § 330(a)(1), which grants the Secretary authority to "regulate the practice of representatives of persons before the Department"; (2) § 330(a)(2), which authorizes the Secretary to condition the "admi[ssion] of a representative to practice" on various characteristics and qualifications; and (3) § 330(b), which governs both suspensions and disbarments of representatives as well as various penalties. See Opp. at 6-8, 20, 22. For its part, the IRS argues that the relevant statute is subsection 330(a)(2) alone. See Mot. at 1; Reply at 4. The Court need not split hairs, however, as it is satisfied that AICPA's interests are wholly incongruent with the interests regulated or protected by all of § 330(a) and the suspension-and-disbarment provisions of § 330(b).

The meat of AICPA's argument pertains to § 330(a). Before looking at that provision, the Court must address two related arguments Plaintiff makes. First, it contends that its members also fall within the zone of interests of the latter portion of § 330(b) that grants the Secretary authority to impose monetary penalties on employers of any suspended or disbarred "representative" if such employer "knew, or reasonably should have known" of the employee's violative conduct. See § 330(b) (2012). Plaintiff relies on this part of subsection (b) to argue that "AICPA members' interests in avoiding . . . increased, unlawful regulation" – by virtue of their employer-employee relationship to unenrolled preparers who participate in the AFS Program – thus "fall within the zone of interests protected by Section 330." Opp. at 20. Such an argument does not fly. As this Court has already noted, the only "grievance" or interest relevant to the zone-of-interests inquiry here is AICPA members' competitive interest in avoiding brand dilution. See supra Section III.B.1. While the monetary-penalty portion of § 330(b) may grant

the IRS power to regulate certain employers, this Court has already concluded that AICPA has not suffered a constitutional injury-in-fact on account of its members' status as employers of unenrolled preparers.  See AICPA I, 2014 WL 5585334, at *5-6; Hazardous Waste Treatment Council v. EPA (HWTC II), 861 F.2d 277, 284 (D.C. Cir. 1988) ("A party is 'regulated' for purposes of the 'zone' test only if it is regulated by the particular regulatory action being challenged.").  Such a ruling was not disturbed on appeal.

In addition, Plaintiff's lengthy explication in its brief of the purposes of § 330, which relies heavily on legislative history, does not discuss employer penalties.  See Opp. at 6-8, 12, 22.  AICPA, in fact, makes no effort to discern Congress's goal in enacting the latter half of § 330(b), which Congress only recently added to the revenue code in 2004.  See American Jobs Creation Act of 2004, Pub. L. 108-357, § 822, 118 Stat. 1418 (Oct. 22, 2004) (granting IRS permission to impose fines on disbarred representatives and their employers, if such employers "knew, or reasonably should have known" of their employees' "incompetent," "disreputable," violative, or fraudulent conduct).  The Court thus concludes that the employer-penalty portion of § 330(b) is not a part of the "relevant statute" here.

Second, in arguing that all of § 330 is fair game for the zone-of-interests analysis, Plaintiff emphasizes the Supreme Court's exhortations in Clarke v. Securities Industry Association, 479 U.S. 388 (1987), to view the relevant statutory provision "in the overall context of" the statutory scheme.  Id. at 401; see Opp. at 22.  The point is well taken, though it bears mention that the Supreme Court later clarified that courts should not zoom out to such a "level of generality in defining the 'relevant statute' [so as to] deprive the zone-of-interests test of virtually all meaning."  Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO, 498 U.S. 517, 529-30 (1991); see also Amgen, Inc. v. Smith, 357 F.3d 103, 109-10 (D.C. Cir.

16

2004) (concluding district court erred by "focus[ing] on the broad purpose of the Medicare Act" as a whole rather than "the more specific interest protected by" the relevant subsection of the "statutory provision whose violation forms the basis for the complaint") (citation omitted). Indeed, it would make little sense to conduct the zone-of-interests analysis here by concluding that the purpose of the Internal Revenue Code, as a whole, is to generate income for the government.  Given Plaintiff's particular grievance here, more granularity is needed.

In addition, Plaintiff has not availed itself of the flexible analysis Clarke suggests, having neglected to conduct any exploration of the statutory scheme as a whole or to cite to other provisions beyond § 330 that it believes will illuminate Congress's intent.  AICPA has simply not done the work of canvassing that "overall context" to distill "Congress' overall purposes" in enacting the Internal Revenue Code, rendering its appeal to Clarke an empty vessel.  See Clarke, 479 U.S. at 401.  As Clarke itself stated, courts "may consider any provision that helps [them] to understand" the interests at stake, id. (emphasis added) – a far cry indeed from a mandate that the Court do the foraging itself.  In sum, then, § 330(a) and those portions of § 330(b) dealing with suspension and disbarment of individuals (but excluding the newly added portion relating to employer penalties) comprise the "relevant statute" for carrying out the zone-of-interests inquiry. (For ease of reference, however, the Court will simply refer to the "relevant statute" as § 330(a) alone.)

3. *Zone of Interests*

With § 330(a) now front and center, the Court must determine the "zone of interests" the statute covers and whether AICPA's members' interests fall within it.  Broadly speaking, the Supreme Court has explained the zone-of-interests requirement as one that seeks to balance Congressional desire for a broadening of the "class of people who may protest administrative

17

action" against the "potential for disruption inherent in allowing every party adversely affected

by agency action to seek judicial review." Clarke, 479 U.S. at 397.  The balance struck by the

Court, then, was that the "interest sought to be protected by the complainant [must be] arguably

within the zone of interests to be protected or regulated by the statute . . . in question."  Clarke,

479 U.S. at 396 (emphases added).

       The D.C. Circuit has further elaborated on these dual approaches to demonstrating that a

plaintiff falls within the zone of interests, explaining:

> As a general matter, there are two types of parties with the right
> incentives to police an agency's enforcement of the laws it
> administers. First, those whom the agency regulates have the
> incentive to guard against any administrative attempt to impose a
> greater burden than that contemplated by Congress. Second, those
> whom the agency was supposed to protect have the incentive to
> ensure that the agency protects them to the full extent intended by
> Congress.

Hazardous Waste Treatment Council v. Thomas (HWTC IV), 885 F.2d 918, 922 (D.C. Cir.

1989) (emphasis added); accord Fed'n for Am. Immigration Reform, Inc. v. Reno, 93 F.3d 897,

900 (D.C. Cir. 1996); Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def., 87 F.3d 1356,

1359 (D.C. Cir. 1996).

       Although AICPA seeks to satisfy the test as a party both "regulated" and "protected" by

§ 330(a), it is only the latter that deserves any attention.  This Court has never concluded that

AICPA's actual members – as opposed to, say, such members' employees – have suffered any

injury as parties "regulated by" the AFS program, and, as it has now twice explained, the only

grievance relevant here is their competitive injury by way of brand dilution.  The Court thus

squarely rejects Plaintiff's argument that it satisfies the zone-of-interests test as a representative

of persons "regulated by" the relevant statute.  See Opp. at 13 (AICPA's "members are regulated

by the IRS through the AFS Rule because they employ unenrolled tax return preparers"); id. at

20 (AICPA's "members' interests in avoiding such increased, unlawful regulation fall within the zone of interests protected by Section 330."); HWTC II, 861 F.2d at 284 ("A party is 'regulated' for purposes of the 'zone' test only if it is regulated by the particular regulatory action being challenged.").

The Court is thus left to grapple with whether AICPA's "members' interests as competitors against unenrolled preparers fall squarely within the zone of interests . . . protected by Section 330[a]." Opp. at 9 (emphases and brackets added).  "A party may demonstrate this in one of two ways: [1] if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute, . . . or [2] if it is a 'suitable challenger' to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives." Scheduled Airlines, 87 F.3d at 1359 (citations omitted); see Clarke, 479 U.S. at 397 n. 12 ("[T]he 'zone of interest[s]' inquiry . . . seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives."); cf. Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1075 (D.C. Cir. 1998) (plaintiff may succeed by showing "an inevitable congruence between" its interests and those protected by the statute).

On the first prong, Plaintiff does not contend that it is an intended beneficiary of the statute.  See Opp. at 6 n.3, 17.  So the Court must decide only whether it is a "suitable challenger," a question that must be answered in two parts.  First, the Court must determine Congress's "implicit purpose[]" in enacting § 330(a) and what interests it was designed to protect.  See Am. Fed'n of Gov't Employees v. Rumsfeld, 321 F.3d 139, 143 (D.C. Cir. 2003); accord Lexmark, 134 S. Ct. at 1389.  Second, it must determine whether Plaintiff's "interests 'are so marginally related to or inconsistent with [those purposes] that it cannot reasonably be

assumed that Congress intended to permit the suit.'"  Mendoza, 754 F.3d at 1017 (quoting

Clarke, 479 U.S. at 399).  Only if it answers the latter question in the affirmative may the Court

conclude that AICPA may not bring suit.

a.  Purpose of Section 330(a)

In enacting § 330(a), Congress intended to protect consumers in need of tax services.  In

reaching this conclusion, the Court finds it useful to focus on AICPA's own take on the statute's

objectives.  At times, Plaintiff appears to argue that Congress's goal in enacting § 330(a) was to

grant limited authority to the IRS to regulate some unspecified aspects of the market for tax-

related services.  See Opp. at 7 (Congress intended to give "the IRS certain authority to regulate

some aspects of the market of services offered to taxpayers.") (emphases added); id. at 8

(Statutory text reflects Congress's desire to "giv[e] the IRS some regulatory authority over the

tax-services marketplace, and its desire to place limits on that authority.") (emphasis added).

This observation may be descriptively accurate, but it is fundamentally question begging

regarding the issue of congressional purposes.  To say that Congress intended to confer

regulatory authority – or even that it intended to confer only limited regulatory authority – says

nothing about why such power was given, and what interests were in mind when such authority

was granted, rendering this explanation wholly unsatisfying.

Perhaps for this reason, Plaintiff does, in other parts of its briefing, make clear that it

views the grant of regulatory authority as a means of realizing "Congress's goal of protecting

consumers," given that the statute "requires representatives to have, among other things, 'good

character' and 'competency to advise and assist persons.'"  Id. at 12 (quoting § 330(a)(2)); id. at

9 (describing goal of statute as "ensuring that taxpayers receive 'valuable service'") (quoting

§ 330(a)(2)(C)); id. at 8 (statute reflects "Congress's desire to protect consumers from

unscrupulous agents").  Indeed, AICPA's own extensive account of § 330(a)'s legislative history

20

reflects its understanding that the provision was principally – if not exclusively – directed

towards consumer protection:

> Originally enacted in 1884 as part of a War Department Appropriation, see Act of July 7, 1884, ch. 334, sec. 3, 23 Stat. 236, 258, the immediate purpose of [what is now § 330(a)] was "to address concerns that military veterans were being cheated by disreputable agents." Joint Comm. on Taxation, Present Law and Background Related to the Regulation of Conduct of Paid Tax Return Preparers 6 & n.28 (2014). . . .  As one member of Congress explained, veterans were being "victimized by the sharks that lie around this city and who make their living by practicing deception on soldiers," taking as much as "one half [of the client's] claim," while the Treasury Department was "unable" to "guard the interests" of these veterans "because no law authorized them to disbar the disreputable claim agents from practice." 15 Cong. Rec. 5222 (1884) (statement of Rep. Townshend).

Opp. at 7.

The Court sees little reason to question Plaintiff's account.  On the contrary, in reviewing

the historical version of § 330(a) – whose language was modified only once in 1982 "without

substantive change," see Pub. L. No. 97-258, 96 Stat. 877, 877 (1982) – the Court concurs that

Congress was animated by a concern for protecting "claimants" who wanted a slice of

congressionally appropriated funds for "horses and other property lost in the military service,"

and that the grant of regulatory authority was designed to effectuate that purpose.  See Act of

July 7, 1884, 23 Stat. 236, 258-59 (authorizing Secretary of Treasury to require of "agents,

attorneys, or other persons representing claimants" to demonstrate, inter alia, necessary

qualifications, and to disbar such persons if they "deceive, mislead, or threaten any claimant or

prospective claimant") (text of original statute republished in Appendix).

The historical statute reveals another important point, which is that Congress's concern

for consumer wellbeing underpins all three of the codified subsections at issue here, (a)(1),

(a)(2), and (b) (excluding the newly added provisions regarding employer penalties).  As can be

seen from the statute's original form, the Secretary's authority to regulate representatives (now reflected in § 330(a)(1)), its authority to require that certain prerequisites be satisfied before a person becomes a representative (now § 330(a)(2)), and its power to suspend or disbar disreputable representatives (now the opening portions of § 330(b)), all flow from the same underlying unease about unscrupulous claim agents and the desire to shield consumers therefrom.  See 23 Stat. at 258-59.

The text of § 330(a) confirms as much.  In providing the Secretary authority to regulate "representatives of persons before the Department," the statute articulates various criteria that reflect a consumer-protective purpose.  For instance, before allowing someone to become such a representative, the Secretary may require her to demonstrate that she possesses the "necessary qualifications to enable the representative to provide to persons valuable service." § 330(a)(2)(C) (emphasis added). [2]  Not a single word in the text of the statute even hints at the notion that Congress had in mind any protection of the interests of service providers, and AICPA has pointed the Court to no other provision of the revenue code that would make such intent clear.  In sum, then, the Court agrees with AICPA that § 330(a)'s core purpose was – and remains – protecting consumers in the tax-services marketplace.  Such authority is not unbounded, see Loving III, 742 F.3d at 1021, but the question here is whether AICPA is a party "with the right incentives to police an agency's enforcement of the laws it administers."  HWTC IV, 885 F.2d at 922.

_____

[2] This provision is not unique to the IRS.  Indeed, analogous provisions that provide other agencies similar gatekeeping authority dot the U.S. Code.  See, e.g., 35 U.S.C. § 2(b)(2) (U.S. Patent and Trademark Office); 38 U.S.C. § 5904 (Department of Veterans Affairs); 42 U.S.C. § 406(a)(1) (Social Security Administration); 43 U.S.C. § 1464 (Department of the Interior).  Many of these provisions, like the one at issue here, also have an expansive history, some of which even pre-date 1884.  See, e.g., Sperry v. State of Fla. ex rel. Florida Bar, 373 U.S. 379, 388 (1963) (recounting history of statutory provisions dating back to 1861 that granted the Commissioner of Patents the authority to regulate practitioners appearing before his office).

### b.  Suitable Challenger

Having identified Congress's purpose in enacting § 330(a) as one of consumer protection, the next step is determining whether <u>AICPA</u>'s interest in avoiding "intensified competition as a result of the [AFS Program]," <u>AICPA II</u>, 804 F.3d at 1197, is congruent with that purpose.  It is not.  On the contrary, AICPA members' competitive interests are on a collision course with Congress's interest in safeguarding consumers.

AICPA's objective here, as it relates to its competitive injury, is to "remov[e] the AFS Rule's spurious credential from the marketplace."  Opp. at 2; <u>see</u> <u>id.</u> at 3 ("[A]s competitors of unenrolled preparers, AICPA members' interests" consist of, *inter alia*, "ensuring that their hard-won qualifications are not diluted by the Rule's unlawful credential.").  Digging deeper, however, its interest relates to "maximizing . . . profits, apparently by avoiding competition with" unenrolled preparers in the market for tax services.  See <u>Liquid Carbonic Indus. Corp. v. F.E.R.C.</u>, 29 F.3d 697, 705 (D.C. Cir. 1994).

On the surface, it seems difficult to square AICPA's interest in dismantling the IRS's program with Congress's goal of safeguarding consumers.  In creating the AFS Program, the IRS aimed to improve unenrolled preparers' knowledge of federal tax law, thereby "protecting taxpayers from preparer errors."  Rev. Proc. 2014-42, § 2.  This objective appears closely aligned with Congress's goal of ensuring taxpayers are provided "valuable service."  31 U.S.C. § 330(a)(2)(C).  AICPA does not impugn the IRS's motive in creating the program or otherwise argue that, apart from the risk of "consumer confusion" – *i.e.*, that consumers might confuse a more-qualified but higher-priced CPA with a less-qualified but cheaper unenrolled preparer – the AFS program does not flow logically from Congress's objective of protecting consumers.  Rather, it seeks to eliminate the Program notwithstanding its potential benefit to consumers precisely because the program's "'government-backed credential[]'" renders "unenrolled

preparers . . . 'better able to compete against other credentialed preparers,' 'uncredentialed

employees of [AICPA] members,' and 'CPAs and their firms.'"  Opp. at 10 (quoting AICPA II,

804 F.3d at 1197-98).

Ignoring this apparent conflict, AICPA argues that its competitive interests are

nevertheless congruent with § 330(a)'s purposes, thereby establishing its status as a suitable

challenger.  In particular, it contends that its suit "advances Congress's goal of granting the IRS

limited authority over the market for providing services to taxpayers by confining the IRS to its

congressionally prescribed bounds."  Opp. at 2; see id. at 9.  In essence, AICPA views itself as a

party whose "interests are such that they 'in practice can be expected to police the interests that

the statute protects,'" Amgen, 357 F.3d at 109, even if Congress did not have AICPA's

members' interests specifically in mind when drafting the law.

In making this argument, Plaintiff leans heavily on a statement from the Supreme Court

in Air Courier Conference in which the court appeared to broadly proclaim that competitors (like

AICPA) of entities regulated by unlawful agency action (ostensibly, unenrolled preparers) are

generally suitable challengers.  See 498 U.S. at 529 ("Clarke[, 479 U.S. 383] is the most recent

in a series of cases in which we have held that competitors of regulated entities have standing to

challenge regulations.") (citing also Inv. Co. Inst. v. Camp (ICI), 401 U.S. 617 (1971); Ass'n of

Data Processing Serv. Orgs., Inc. v. Camp (Data Processing), 397 U.S. 150 (1970)).  It goes

without saying, of course, that neither Clarke nor Air Courier Conference stands for the

proposition that all competitors of regulated parties perforce come under the zone of interests of

any underlying statute: "It is a maxim not to be disregarded, that general expressions, in every

opinion, are to be taken in connection with the case in which those expressions are used."

Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400 (1821); accord Air Courier Conference,

24

498 U.S. at 529 ("This statement, like all others in our opinions, must be taken in the context in which it was made.").

Indeed, context matters a great deal on this point, as the line of authority referred to in Air Courier Conference bears little resemblance to AICPA's posture here. Those cases, which the D.C. Circuit has helpfully labeled the "entry-restriction cases," involve "competitors attempting to confine a regulated party within certain statutory guidelines." See Liquid Carbonic, 29 F.3d at 705. For instance, in Clarke, the competitor-plaintiff was an association representing the securities industry, the regulator was the Comptroller of the Currency, and the regulated party consisted of national banks. See 479 U.S. at 392. The plaintiff was dissatisfied with the Comptroller's decision to loosen restrictions on banks' ability to offer discount brokerage services, which had the effect of allowing banks to compete for those services in a space that had historically been free from such competition. The Court, looking to the similar circumstances presented by Data Processing and ICI, concluded that the plaintiff fell within the "zone of interests" of the National Bank Act and could thus argue that the Comptroller's decision contravened language in that statute that it believed should keep banks out of the interstate discount-brokerage market. This was so even though plaintiff's members were neither regulated nor expressly protected by the Act itself. See id. at 394-403; id. at 403 ("Congress [has] arguably legislated against the competition that [respondent seeks] to challenge . . . by limiting the extent to which banks can engage in the discount brokerage business and hence limiting the competitive impact on nonbank discount brokerage houses.") (citations and quotation marks omitted).

In Clarke – as was the case in ICI – the competitor-plaintiff and its members were "among the class of persons entitled to sue to enforce [the relevant statute's] restrictions"

because their interests (keeping banks out of interstate discount brokerage-services market) were aligned with the relevant statute's purposes (protecting smaller state banks from competition from by larger, national competitors).  First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin., 988 F.2d 1272, 1275-76 (D.C. Cir. 1993), aff'd, 522 U.S. 479 (1998).  In this way, the "potentially limitless incentives of [the] competitors were channelled [*sic*] by the terms of the statute into suits of a limited nature brought to enforce the statutory demarcation dividing the banking and securities industries."  Id. at 1278.  Specifically, "because [the statute's] entry-like restriction itself reflects a congressional judgment that the constraint on competition is the means to secure the statutory end[,] [t]he restriction connects the economic interests of competitors to the purposes of the statute and yet constrains competitors to a limited role in guarding a congressionally drawn boundary."  Id.  at 1278.

Although these are not facile distinctions, those entry-restriction cases – which also include Data Processing and National Credit Union – differ quite substantially from AICPA's challenge here because of both the nature of the "relevant statute" and the interests of AICPA's members relative to unenrolled preparers.  A preliminary point is that 31 U.S.C § 330(a) is not an entry-restriction statute.  The IRS simply lacks any authority under that provision to regulate tax-preparation services, see Loving III, 742 F.3d at 1022, meaning that unenrolled preparers, enrolled agents, attorneys, and CPAs are all free to prepare taxes for compensation.  In other words, the only thing the statute has to stay about the tax-preparation market is that the IRS has no business regulating it, meaning anyone can compete in that space.  There is therefore no statutory requirement that, if duly enforced, would prevent an unenrolled preparer "from offering its services and competing in a broader market" served by CPAs.  First Nat'l Bank, 988 F.2d at 1277; see Clarke, 479 U.S. at 403 (plaintiff may satisfy zone-of-interests test where Congress

"arguably legislated against the competition").  AICPA therefore cannot reasonably contend that

its suit, if allowed to proceed, will dutifully "enforce [a] statutory demarcation dividing" the

services it provides from those rendered by unenrolled preparers.  See id. at 1277-78 (plaintiffs

in entry-restriction cases like Clarke are seeking to "confin[e] a regulated industry within certain

congressionally imposed limitations [and] may sue to prevent the alleged loosening of those

restrictions").

       More important, AICPA has not offered "the slightest reason to think that [its members']

interest in getting more revenue by" eliminating the brand-diluting effect of the government's

credential "will serve [§ 330(a)'s] purpose of protecting [consumer welfare]."  HWTC IV, 885

F.2d at 924.  For this reason, AICPA's challenge is far more closely aligned with the

unsuccessful challenges brought by plaintiffs in HWTC IV and Liquid Carbonic, in which

competitors failed the zone-of-interests analysis because their interests were inconsistent with the

relevant underlying statute.

       In HWTC IV, for instance, a trade association of companies that treated hazardous waste

brought suit against the Environmental Protection Agency, asking it to more strictly regulate

other companies under its Resource Conservation and Recovery Act (RCRA) authority in such a

way as to steer more business into the waste-treatment-services market.  See HWTC IV, 885

F.2d at 924-25.  As the trade association saw things, if EPA imposed stricter standards on how

hazardous waste needed to be handled, that would have the salubrious effect of growing its

members' pool of customers.  Id. at 924.  In concluding the trade association failed the zone-of-

interests test, the Court of Appeals found that the plaintiff's interests were simply not in

alignment with the RCRA's interest in "protecting health and the environment," as there might

easily be circumstances in which the EPA might, in implementing RCRA, harm the plaintiff's

interest even when remaining faithful to RCRA's purposes.  Id. at 924-25 (enumerating variety

of ways in which EPA's regulatory choices might fulfill RCRA's objectives but result in

decrease in business for association's members).  Reinforcing the point by way of example, the

Court explained:

> HWTC's claim [that it satisfies the zone-of-interests test] is
> precisely analogous to a defense contractor's claim to [have satisfied
> such a test] under an appropriations law in order to challenge the
> Defense Department's decision to purchase one type of weapon
> rather than another. The interest of such a firm in profits is not
> limited by the public's need for its type of weapon, and
> notwithstanding the sometimes contrary impression one encounters,
> the annual defense appropriation is not passed in order to benefit
> defense contractors, benefit them though it may.
>
> Because we have no way of knowing (short of deciding the merits
> of HWTC's claim) the extent to which HWTC's interest in more
> rigorous treatment standards will be likely to further rather than to
> frustrate Congress's interest in protecting human health and the
> environment, and because judicial intervention may defeat statutory
> goals if it proceeds at the behest of interests that coincide only
> accidentally with those goals, HWTC is [not a suitable
> challenger] . . . .

Id. at 925 (citation and quotations omitted); accord Liquid Carbonic, 29 F.3d at 705 (Liquid $CO_2$-

producing firm that "opposes the entry into the liquid $CO_2$ market of [certain second-tier

competitors]" failed zone-of-interests test where "it is clear that [plaintiff's] interest has nothing

to do with the energy conservation goals of [the Public Utility Regulatory Policies Act].").

AICPA meets with a similar outcome.  Its members' interest in avoiding competition is

directly opposed to the consumer-protective interests articulated by § 330(a).  AICPA can offer

no explanation, apart from the consumer-confusion argument that the Court of Appeals declined

to address in AICPA II, as to why its interest in dismantling the AFS Program furthers

Congress's goal of consumer protection.  For this reason, the Court need not address AICPA's

second argument for why it comes within § 330(a)'s zone of interests, which is wholly premised

on this consumer-confusion concept.  See Opp. at 12 (arguing that AICPA's "effort to protect its members from an unlawful distortion of the tax return preparation marketplace is congruent with" Congress's interest in "protecting consumers" because "the AFS Rule will confuse consumers, who will [erroneously] conclude that the IRS has endorsed tax return preparers who have complied with the AFS rule") (citation and quotation marks omitted).

Even if this Court were to view AICPA's objective here as aligning, at least in part, with Congress's broad goal of protecting consumers, such a "coincidence in . . . interests would be at best fortuitous."  First Nat'l Bank, 988 F.2d at 1275 (citation and quotation marks omitted). Instead, the Court believes that AICPA's interest in avoiding the "regulation" of its competitors – which, as manifested in the AFS Program, includes an incentive program that may well cause competitive harm to CPAs – is "more likely to frustrate than to further statutory objectives" of § 330(a).  Clarke, 479 U.S. at 397 n.12.  The Court thus concludes that Plaintiff lacks a cause of action under the APA to mount its challenge to the AFS Program.  See Judicial Watch, Inc. v. U.S. Senate, 432 F.3d 359, 365 (D.C. Cir. 2005) ("[T]he 'zone of interests' requirement . . . poses the question whether the plaintiff's interest is so incongruent with the statutory purposes as to preclude an inference that Congress might have intended such a party as a challenger.").

*   *   *

A final word.  While AICPA does not have a cause of action under the APA to bring this suit, the Court has little reason to doubt that there may be other challengers who could satisfy the rather undemanding strictures of the zone-of-interests test.  "The same claim may be viable in the hands of one challenger and not in those of another that, for example, has interests that make it less than a reliable private attorney general to litigate the issue of the public interest in the . . . case."  HWTC IV, 885 F.2d at 925-26 (citations and quotation marks omitted).  Given the

points raised in the merits briefing, which the Court now has no occasion to consider, Defendant

may wish to ensure that its Program was properly promulgated before a suitable party mounts its

own challenge.

## IV.    Conclusion

For these reasons, the Court will grant Defendants' Motion for Judgment on the

Pleadings and dismiss the case.  A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:    August 3, 2016

## **APPENDIX**

I.     **31 U.S.C. § 330 [Effective: August 17, 2006 to December 17, 2015]**

**§ 330. Practice before the Department**

(a) Subject to section 500 of title 5, the Secretary of the Treasury may—

(1) regulate the practice of representatives of persons before the Department of the Treasury; and

(2) before admitting a representative to practice, require that the representative demonstrate—

(A) good character;

(B) good reputation;

(C) necessary qualifications to enable the representative to provide to persons valuable service; and

(D) competency to advise and assist persons in presenting their cases.

(b) After notice and opportunity for a proceeding, the Secretary may suspend or disbar from practice before the Department, or censure, a representative who—

(1) is incompetent;

(2) is disreputable;

(3) violates regulations prescribed under this section; or

(4) with intent to defraud, willfully and knowingly misleads or threatens the person being represented or a prospective person to be represented.

The Secretary may impose a monetary penalty on any representative described in the preceding sentence. If the representative was acting on behalf of an employer or any firm or other entity in connection with the conduct giving rise to such penalty, the Secretary may impose a monetary penalty on such employer, firm, or entity if it knew, or reasonably should have known, of such conduct. Such penalty shall not exceed the gross income derived (or to be derived) from the conduct giving rise to the penalty and may be in addition to, or in lieu of, any suspension, disbarment, or censure of the representative.

(c) After notice and opportunity for a hearing to any appraiser, the Secretary may—

(1) provide that appraisals by such appraiser shall not have any probative effect in any administrative proceeding before the Department of the Treasury or the Internal Revenue Service, and

(2) bar such appraiser from presenting evidence or testimony in any such proceeding.

(d) Nothing in this section or in any other provision of law shall be construed to limit the authority of the Secretary of the Treasury to impose standards applicable to the rendering of written advice with respect to any entity, transaction plan or arrangement, or other plan or arrangement, which is of a type which the Secretary determines as having a potential for tax avoidance or evasion.

**II.     Act of July 7, 1884, ch. 334, 23 Stat. 236, 236, 258-59**

Be *it enacted by the* Senate *and House of Representatives of the United States of America in Congress assembled*, That the following sums be, and the same are hereby, appropriated . . . .

For horses and other property lost in the military service prior to July first, eighteen hundred and eighty one, one hundred and twenty five thousand seven hundred and eighty seven dollars and three cents: *Provided*, That the Secretary of the Treasury may prescribe rules and regulations governing the recognition of agents, attorneys, or other persons representing claimants before his Department, and may require of such persons, agents and attorneys, before being recognized as representatives of claimants, that they shall show that they are of good character and in good repute, possessed of the necessary qualifications to enable them to render such claimants valuable service, and otherwise competent to advise and assist such claimants in the presentation of their cases.  And such Secretary may after due notice and opportunity for hearing suspend, and disbar from further practice before his Department any such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to comply with the said rules and regulations, or who shall with intent to defraud, in any manner willfully and knowingly deceive, mislead, or threaten any claimant or prospective claimant, by word, circular, letter, or by advertisement.